**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | |
| **v.** | \* | **Criminal No. 25-cr-00096-TDC** |
| **JAMES E. MCCOLLUM** | \* | |

### <u>SENTENCING MEMORANDUM OF JAMES E. MCCOLLUM, JR.</u>

*Because I have sinned against him,*

*I will bear the Lord's wrath, until he pleads my case and upholds my cause.*

*He will bring me out into the light; I will see his righteousness.*

*-Micah 7*

**TABLE OF CONTENTS**

I.      INTRODUCTION............................................................................................... 1

II.     MR. MCCOLLUM'S PERSONAL HISTORY AND CHARACTERISTICS ARE
        SIGNIFICANTLY MITIGATING.................................................................. 4

        A.      Mr. McCollum's personal history ......................................................... 5

                1.      Childhood................................................................................. 5

                2.      High School & College ............................................................ 9

                3.      Law School and Early Career.................................................. 12

                4.      Mr. McCollum's Family........................................................... 13

                5.      Mr. McCollum's Faith ............................................................. 15

                6.      Mr. McCollum's Law Firm ...................................................... 16

                7.      ███████████████████████████████████

        B.      ████████████████████████████████████████

                █   ████████████████████████████████████

                █   ████████████████████████████████████

        C.      Mr. McCollum's personal characteristics. ........................................ 24

                1.      Integrity and honesty.............................................................. 24

                2.      Generosity and compassion .................................................... 24

                3.      Hard work and humility .......................................................... 26

                4.      Remorse and accountability.................................................... 27

                5.      ███████████████████████████████████

III.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT
      LENIENCY. .................................................................................. 29

      A.   McCollum's history of tax compliance and non-compliance reflects his firm's
           financial instability, not an effort to evade. ................................................ 29

      B.   Mr. McCollum was unable to run his law firm profitably. .............................. 30

      C.   The COVID-19 pandemic had a devastating impact on Mr. McCollum's law
           firm. ................................................................................................ 35

      D.   ███████████████████████████████████████████
           ███████████████. .................................................................. 36

      E.   Mr. McCollum received ineffective tax representation from James Renner. 37

      F.   Mr. McCollum did not intend to deceive the IRS by creating The McCollum
           Firm in 2019 ...................................................................................... 39

      G.   Mr. McCollum has worked cooperatively with the IRS and has taken full
           responsibility for his failure to pay over employment taxes. ......................... 40

IV.   THE REMAINING SENTENCING FACTORS SUPPORT A SENTENCE OF
      PROBATION ................................................................................... 41

      A.   Just punishment and respect for the law would not be served by
           incarceration. .................................................................................... 41

      B.   Incarceration is not necessary to afford adequate deterrence or to protect the
           public. ............................................................................................. 43

      C.   The Bureau of Prisons ("BOP") ████████████████████
           ████████████████████████████████████████████ 44

      D.   The advisory guideline range, driven primarily by the "loss" amount, is an
           inaccurate measure of culpability ......................................................... 47

      E.   A sentence of probation would not create unwarranted disparities. ............. 48

      F.   A sentence of probation prioritizes the need to provide restitution. .............. 50

V.    SENTENCING HEARING ............................................................... 51

VI.   CONCLUSION ................................................................................. 51

## I.   INTRODUCTION

James McCollum has devoted his entire 70-year life to service, church, and family. From an early age, he showed a singular level of compassion and dedication to others. After confronting extreme and traumatic challenges as a child, including ███████████████ and pervasive discrimination and threats in Jim-Crow-era Richmond, Virginia, he achieved extraordinary academic and professional success. Rather than leverage that success into wealth and prestige—which he easily could have done—he built a community law practice in College Park, MD. There, he built a career focused on protecting and uplifting others who were also facing adversity. He did this work quietly and with no need for recognition. He has led a humble and modest life: he drives a 17-year-old car, lives in the same house he purchased with his wife in Hyattsville in 1985, and rarely takes vacations.

As an advocate, he took on clients no one else would help. He assisted widows who were left encumbered by debts after their husbands died. He helped Black women and people with disabilities who faced discrimination at their places of work. He exonerated two men falsely accused of rape on the Eastern Shore of Maryland. He supported the advancement and professional success of dozens of young Black and Brown people in his community.

At home, he nurtured and raised two bright young women. ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████

1

At church, Mr. McCollum built a strong community of devotion and worship. When the beloved Pastor of his church died, he opened his office to a weekly bible study, which he has now led for over two decades. Mr. McCollum takes his obligation to tithe and do good works seriously: to this day, even as his family struggles to make ends meet, he can be found purchasing and delivering groceries to people in need around him.

But Mr. McCollum is not perfect. He is not, and never has been, a good businessman. For the entire life of his firm, he maintained his payroll on a paper ledger, and issued handwritten checks to his staff. He never fired anyone in the 37 years that he ran his law firm, even when he had strong grounds to do so. He excused and reduced the debts of his clients when he should not have. He made poor decisions about strategies to grow his firm's income and business. He was incapable of delegating tasks, and held on to the financial management of his firm even as its debts grew. For years he willfully blinded himself to how dire a situation his failure to pay-over employment taxes had created, or the harmful consequences of that failure on his employees, convincing himself that a case would deliver the means to climb his way out of an ever-deeper hole and that it was better to keep people employed than tell them the truth about their wages. Rather than address these problems, he took shelter in his work. Then, the COVID-19 pandemic hit, destroying Mr. McCollum's ability to contain an increasingly catastrophic financial scenario.

2



***

Section 3553(a)(2) directs the court to consider four purposes of sentencing. Simply stated, those purposes are punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2). As described in greater detail below, consideration of each § 3553(a)(1) factor confirms that a sentence of imprisonment is not needed to deter, incapacitate, or rehabilitate Mr. McCollum. That leaves only one purpose that a term of imprisonment could truly serve in this case: punishment.

But Mr. McCollum has already been severely punished. He has lost his law practice, surrendered his law license, and ended a prominent career in disgrace. Reports of Mr. McCollum's guilty plea and disbarment have been published in local and national media. He will continue to face enduring public embarrassment and opprobrium. This is a devastating outcome for a person who has dedicated his life to upholding values of integrity, honesty, and service to others. ███████████, ████████████████████████████████████████████, urges the Court to impose a non-incarcerative sentence:

███████████████████████████████████████████████

3



Ex. C at 43. (Character Letters)

On the day he stood before the Court to enter his guilty plea, Mr. McCollum thought only of his mother, imagining the deep shame she would have felt at this end to his illustrious career. His wife, Symone Colquitt, writes:

> There is much that I know about James. Yet there is much that I will never know. What I do know is that it pains him profoundly to be before the Court, not as an upholder of the law, but as one who has violated the law. The pain for him, I know, is excruciating and difficult to bear.

Ex. C at 2. Mr. McCollum confirms that "[t]his painful, humiliating and stressful situation that I created has caused an acute negative impact on my family, as well as the loss of my legal career." Ex. D (Allocution).

For all these reasons—and others discussed below—a sufficient sentence to "provide just punishment" in this matter would be a sentence of probation. Such a sentence would recognize Mr. McCollum's early plea of guilt, his lifetime of devotion and service to his clients, community, and family, his age ███████, and the severe collateral consequences he has already experienced.

## II.    MR. MCCOLLUM'S PERSONAL HISTORY AND CHARACTERISTICS ARE SIGNIFICANTLY MITIGATING

As the more than forty letters submitted on his behalf attest, Mr. McCollum is a deeply religious man who has lived a life characterized by service, generosity, and devotion. "He is someone who has spent a lifetime giving others second chances—clients, former employees,

4

students, and friends alike." Ex. C at 62 (███████). His positive impact on the lives of family, friends, and clients is evident in this outpouring of support.

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006); *see also United States v. Ranum*, 353 F. Supp. 2d 984, 991 (E.D. Wis. 2005) (imposing non-Guidelines sentence where "numerous friends and business associates wrote letters attesting to defendant's good character").

### A.   Mr. McCollum's personal history.

#### 1.  Childhood

Mr. McCollum's story is one of resilience, faith, hard work and sacrifice.

He grew up in the Jim Crow south. At age two, his family moved from Texas to Richmond, Virginia. At that time, Richmond was still deep in the grip of a sophisticated racial caste system that dictated strict separation of the races. Black residents could not use water fountains, bathrooms, beaches or swimming pools used by whites, could only order takeout food from restaurants that served whites, and attended separate schools. This backdrop of violence, inequity, and struggle permeated every aspect of Mr. McCollum's formative years.

Mr. McCollum grew up in a fractured home. James, Sr., the person Mr. McCollum knew as his biological father until his mid-sixties, was a medical specialist in the Army. Mr. McCollum's father was often called away by military service, ████████████████ ██████████████████████████████████████████ ██████████████████████████████████ He brought a military approach to the household, ████████████████████████████:

5

██████████████████████████████████

██████████████████████████████████

████████████████████████.



*James and Lucille, 1956*

Lucille,[1] Mr. McCollum's mother and primary parent, was a registered nurse. A first-generation United States citizen, Lucille instilled in her children the values of hard work, faith, and civic responsibility. Ex. C at 10 (Judith McCollum Stallings). She worked tirelessly to keep a roof over the family's head and food on the table. *Id.* at 1. When Mr. McCollum and his sister were young, Lucille worked the night shift from 11 PM to 7 AM, hiring a woman to stay with them overnight. During the day, she would care for the children.

The family struggled, but had enough to keep a roof over their head and food on the table. Silas Elwood York, Jr., who has known Mr. McCollum since kindergarten, recalls that:

> We grew up poor in the segregated south in the Capital of Confederacy. . .
>
> James did not grow up privileged . . . we had to get dressed at night and sit around the furnace to stay warm. I used to complain to James how tough it was on me that I had to take papers, cut grass to get enough money to buy shoes from Pick-a-Pair ($5 for two pair of shoes 1 pair for Church and 1 for school) until he reminded me of how lucky I was because he had a younger sister which meant there was only enough money for a pair of shoes each.

---

[1] For the sake of clarity, this memo refers to Mr. McCollum's family members by their first name.

6

Ex. C at 81.

From a very early age, Mr. McCollum shouldered significant responsibility in the home. His sister, Judith, recalls that James embraced the role of "protector and provider." Ex. C at 10. He began working early. "[W]hen he was about 12 years old, he came home and announced to our mother that he had signed up to get a paper route, so he could help out and



*Mr. McCollum, age 12, and his family.*

earn some money." *Id.* at 11. The job was not easy: on his route, Mr. McCollum was "personally subjected to racial animus and verbal abuse as a child delivering newspapers . . . [r]acial slurs were yelled at him, dogs were set out on him as he rode his bicycle, and some of his customers refused to pay him." Ex. A at 11 ▆▆▆▆▆▆▆).

Incidents like that were routine in segregated Richmond, where it was dangerous for Black children to move outside of the predominantly Black neighborhoods. At one point in Mr. McCollum's childhood, he and his cousin, Tony, inadvertently rode their bicycles into a white neighborhood. They were surrounded by a group of white men and boys holding knives, who told them that they needed "N***r blood" for initiation into the Ku Klux Klan. After holding Mr.



*As a child, Mr. McCollum showed early promise.*

McCollum and his cousin for a period of time, they released them. PSR ¶ 37. When the children reported to their parents what had happened, they were punished for going into the white neighborhood. At his segregated elementary school, teachers taught James and his classmates that they "would have to be 'twice as good' in order to survive in our society." Ex. C at 10 (Judith Stallings McCollum).

From a young age, Mr. McCollum stood apart from his peers in both aptitude and character. Mr. York writes that:

> I met James in kindergarten, pre-first grade. He was elected by the students and the nuns to be the nap and lunch monitor. He was the spokesperson when the kids didn't have blankets, lunch or lunch money to the Nuns when most of us were too ashamed to admit it. He settled disputes and was always fair and understanding. In our class play he was front and center singing the Lord's Prayer and the National Anthem.

Ex. C at 80. Mr. McCollum was also active in church and the Boy Scouts. *Id.* He enjoyed playing sports and had many other interests, including comic books, collecting marbles, and music.

8

## 2.  High School & College

As Mr. McCollum grew older, Richmond was changing too, moving through a turbulent period of upheaval along with the rest of the United States. In 1970—16 years after *Brown v. Board of Education*—Federal District Judge Robert Merhige ordered a citywide busing program, and Mr. McCollum joined the first class of black students to be bussed to George Wythe High School.[2] Mr. York recalls that:



*White residents of Richmond vigorously opposed school busing; many withdrew their children from school and moved out of the city completely.*

> Our first day of High School we were rewarded by having our "forced" bus bricked, battered, and shot at. We were not deterred, we walked to school thereafter as it was safer to be able to run on foot than be a sitting duck on an old slow moving yellow bus. James was never deterred by the adversity or the obstacle . . . saying "all you can ever do is be the best you can and obey the Scout Law."

Ex. C at 80. During his high school years, Mr. McCollum and his classmates saw crosses being burned on lawns; they heard stories of bullets being shot through windows.[3]

Despite Mr. McCollum's obvious talent and intellect, white teachers discouraged and diminished him. Mr. McCollum recalls a teacher who wore a confederate flag on his lapel. When he handed him his grades at the end of the year, he told Mr. McCollum: "I think you are the smartest n\*\*r I've ever seen." Growing up, he "went through periods of anger, isolation, and

---

[2] Harry Kollatz, Jr. *Busing for Equality*, RICHMOND MAGAZINE (Sept. 18, 2020), https://richmondmagazine.com/news/richmond-history/busing-for-equality/.

[3] In 2018, Virginia Commonwealth University created an exhibition of oral histories about Wythe High School during the period of busing from 1970–72. https://www.fightforknowledge.org/wythe

school avoidance," but then would reengage after his mother intervened. Ex. B at 3 (DeRight Report). During his Presentence Investigation Report ("PSR") interview, Mr. McCollum reported that he was "More scared of his mother than the Ku Klux Klan ("KKK")."

Going to a previously white school meant that there were more resources. Compared to the schools he had attended before, the George Wythe "curriculum was unbelievable."[4]

> The 1974 CHANCELLOR is dedicated to the Class of 1974, the class which fought against the prejudices of its parents and its world — and won.

*The inscription to Mr. McCollum's high school yearbook.*

Mr. McCollum grabbed every opportunity he could, playing football, leading the school paper, and participating in student government. He also took on a major role in an organization developed to improve race relations at the school. "[H]e traveled to different locations in [Richmond] to address the issues of integration; its impact on students and how to resolve problems." Ex. C at 11 (Judith McCollum Stallings). Ultimately, Mr. McCollum graduated in the

---

[4] Megan Pauly, *Wythe then and now: Alumni reflect on the state of their school*, Virginia Public Media (Apr. 20, 2022) (updated May 14, 2025), available at https://www.vpm.org/news/2022-04-20/wythe-then-and-now-two-alumni-reflect-on-the-state-of-their-school.

top 5% of his class with honors, winning a National Achievement Award and a scholarship to

Indiana University. *Id.*



Unfortunately, Mr. McCollum's move to Indiana did not mean an escape from the ever-

present threat of racial violence. The Ku Klux Klan ("KKK") originated in Indiana, and they

maintained an active presence in the 1970s. Just a few years before Mr. McCollum arrived to

attend college, the KKK blew up a black bookstore that had opened in town.[5] During his time at

school, they would march and burn crosses. Mr. McCollum remembers when he started

college—he arrived at the bus station in Bloomingdale at night with a green duffel bag and black

trunk in hand. He did not have a ride, and walked from the station to campus. To this day, he

remembers the fear he felt during that journey.

On campus, Mr. McCollum sought respite in a community of tight-knit friends and

studies. He joined Omega Psi Phi, a Black fraternity that had been founded at Howard

University. But he did not engage in the type of carousing often typical in college fraternities.

His friend, Carol Toler, recalls that instead, Mr. McCollum somehow convinced "a few dozen

---

[5] *See* Rachel Smith, *What remains of the Black Market after the 1968 firebombing* (Feb. 6, 2023), https://tinyurl.com/hws2kavs.

fraternity brothers and our broader circle of friends to attend Sunday church services in the 1970's which was and still is remarkable." Ex. C at 64. In 1977, he met the woman who would become his wife, Symone Colquitt. He continued to excel, and graduated with top honors. A few years later, he was granted admission to Howard University School of Law.

### 3. Law School and Early Career

In law school, Mr. McCollum again achieved remarkable success. He was the editor-in-chief of the law review, and graduated first in his class. That made his "mother extremely proud." Ex. C at 12 (Judith McCollum Stallings). "[O]ne of James' law professors [wrote] her a letter that thanked her for raising a fine young man she could be proud to call her son." *Id.* Lucille "talked about this letter many times and I believe she realized even more that the sacrifices she made for us were not in vain." *Id.*



*Mr. McCollum and Ms. Colquitt at his law school graduation.*

After graduating, Mr. McCollum clerked on the Second Circuit for Judge Lawerence W. Pierce, and then was selected to clerk on the Supreme Court for Justice John Paul Stevens. Mr. McCollum was one of the first Black lawyers and the first Howard Law graduate to clerk on the Supreme Court. *See* Ex. E. After graduation, Mr. McCollum worked at the white-shoe law firm Covington & Burling for a year-and-a-half before joining the Department of Justice Office of the Special Counsel during the Iran-Contra Investigation.

### 4. Mr. McCollum's Family

After finishing his Supreme Court clerkship in 1985, Mr. McCollum and Symone got married. Their oldest daughter, E███, was born three years later. When E███ was three, A███ was born.



_____

[6] Kim Whaley, an investigator for the Federal Public Defender's office, interviewed Symone for several hours to gather additional information about Mr. McCollum's history and characteristics.

[7] ████████████████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

████████████████████████████████████████

████████████████████ She is a writer and an artist, and she

often assists her father in the office with his cases and work. Vanessa Hall, a friend of the couple,

writes that "James and his wife have always exemplified what it means to work together as a

couple in support of their beautiful young lady." Ex. C at 76. ████████████████

████████████████████████████████████

█████████████████████████████A███ is a

talented artist with a personal drive to help others" who is "known to participate in special events

and activities that impact special needs communities." Ex. C at 48 (Patricia F. Mead).



14

E⬛, Mr. McCollum's oldest daughter, has led a successful career and is a "leading expert on cultural influences that impact activism and cultural identity." Ex. C at 48 (Patricia Mead). She now lives in North Carolina with her husband and two children, and writes that:

> I have always had a good relationship with my father, even as I moved around the country to pursue my career and raise my family. My father has never missed a graduation, a birth of my children, or any other significant event. He supports me fully; I am, and always have been, grateful for his unwavering love and commitment to fatherhood and now grand-fatherhood.

Ex. C at 6. Mr. McCollum's grandchildren love seeing him; whenever he visits, he cooks everyone pancakes for breakfast and the children compete to see who can eat the most. "As a grandfather, James is nurturing and devoted. He delights in spending time with his grandchildren—reading stories, sharing wisdom, and engaging in playful activities that spark creativity and confidence.." Ex. C at 20–21 (Mr. & Mrs. Campbell).

### 5.  Mr. McCollum's Faith

When they moved to DC, Mr. McCollum and Symone joined the Rhema Christian Center Church in Washington, D.C., and continued to build and strengthen their relationships with their community and neighbors. Mr. McCollum served on various boards and committees at Rhema, including the Deacon and Deaconess board, and the Shepherd's Fish Ministry.

About twenty years ago, the longtime Pastor at Rhema died, and the quality of services declined, causing Mr. McCollum and many of his brethren to leave. Ex. C at 51 (Julie Plush). As they sought a new spiritual home, Mr. McCollum opened his conference room and began hosting a weekly bible study. "That group started around 10 people, and he has continued to grow that community. They meet regularly to pray, often over 50 people, to this day." Ex. C at 7 (Elan Hope). Mr. McCollum prepares a 90-minute lesson each week, and never misses a session. Ex. C at 19 (Mr. & Mrs. Campbell). Many letters to the court discuss the impact of Mr. McCollum's bible study on their lives:

- "Beyond teaching, James provides wise, Christ-centered counsel to members of our Bible class that transforms lives and brings comfort during struggles. Whether someone is facing grief, family challenges, or personal crises, James offers guidance rooted in Scripture and compassion, helping individuals find hope, peace, and practical steps forward. His counsel is never judgmental; it is restorative, reminding us of God's grace and the possibility of renewal. Many of us have experienced breakthroughs and healing because of his wisdom and strong faith." Ex. C at 20 (Mr. & Mrs. Campbell).

- "In 2020, Friday nights were Bible Studies via Zoom led by Deacon James E. McCollum, Jr. along with members of his church congregation. It kept my spirits up since in-person attendance was discouraged during the pandemic." Ex. C at 40 (Nashira Jackson).

- "More than a recitation of scripture, his Bible Studies are filled with the Holy Spirit that address the challenges and spiritual needs of the attendees (including myself)." Ex. C at 44 (Isaac H. Marks).

- "Sessions were life changing, transformative, and a blessing." Ex. C at 66 (Iva Toler).

- "[T]hose bible studies served as a stable foundation for me to stand on during my emotionally turbulent years of law school, as well as a "front-row seat" from which I witnessed a completely counter-cultural attorney and man of character serve as salt and light in his community." Ex. C at 71 (Mark Wade, Jr.)

Mr. McCollum's "faith in God is authentic and his concern for others is sincere." Ex. C at 32 (Ray Hall). For 23 years, he and several friends have engaged in a one-week period of fast and prayer. *Id.* He also connects daily with a group of individuals every day for prayer at 5:00 a.m. *Id.* He "ministers on a regular basis to a number of individuals that seem to be alone and less fortunate," checking up on them regularly and giving them food or clothing. Ex. C at 56 (Edith Pyles).

### 6. Mr. McCollum's Law Firm

In 1988, Mr. McCollum opened the doors to his law firm in College Park, MD. During his time at Covington & Burling, Mr. McCollum had realized that the priorities of a large law firm— representing large corporations in search of large profits—did not align with his own priorities or interests. Mr. McCollum's friend, former client, and current boss Gary Puckrein writes:

When he completed his legal education, he made a deliberate choice that revealed his character: he declined opportunities at large law firms to become a community lawyer. He built a practice serving individuals who could not afford the fees that large firms charge. This was not a fallback position but a principled decision to use his professional skills where they were most needed. I have witnessed his dedication to clients who had no other advocate, his willingness to take cases without regard to their profitability, and his genuine concern for the welfare of the people he served. I know this for a fact, because he provided time consuming and expens[ive] legal service[s] to our nonprofit at a time when we could not afford to pay him.

Ex. C at 54.

As an attorney, Mr. McCollum built a reputation for honesty, integrity and diligence. Mr. McCollum's choice to open a community law firm made an enormous impact on the lives of his clients, employees, and mentees. Mr. McCollum became a recognized and respected fixture of the Maryland legal community, representing hundreds of clients in criminal and civil matters before the state and federal courts in Maryland and D.C. He was well-respected by his peers, who often referred him work.

There is not enough space here to discuss the broad range of clients and cases that comprise the fabric of Mr. McCollum's legal career. But his representation of two men: David Veney and Grant Jones, stands out and provides important insight into the exceptional lawyering, advocacy, and professionalism with which Mr. McCollum served his clients, the interests of justice, and the rule of law.

David Veney and Grant Jones were both falsely accused of rape by the same woman.

In 1996, David Veney, was arrested for rape based on a vague identification.[8] The complainant, "A.A." described her attacker as a 6-foot-tall Black man with strong body odor.

---

[8] Ken Otterbourg, *David Veney*, The National Registry of Exonerations, https://exonerationregistry.org/cases/13540 (last accessed Dec. 21, 2025).

Veney's probation officer noticed his odor and, because he lived near the victim, notified police. The victim identified Veney from a photo array, and he was ultimately convicted of first-degree rape and burglary and sentenced to 25 years imprisonment.

In 2005, Mr. Veney's father, who was the pastor of a small church that Mr. McCollum represented, asked Mr. McCollum to review the case. Mr. McCollum met with Mr. Veney at the jail for several hours and walked out convinced of his factual innocence. He undertook an investigation, uncovered substantial evidence of actual innocence, and he filed a postconviction petition alleging ineffective assistance of counsel. The prosecutors agreed with the merits of the petition, and agreed to a new trial. After further investigation, they declined to re-prosecute the matter at all. The charges were dismissed on July 15, 2005, and Mr. Veney was released from prison that day.

But Mr. McCollum was not done helping Mr. Veney. In 2021, the Maryland legislature passed the Walter Lomax Act, which provides compensation for proven or pardoned wrongful incarceration. On December 20, 2021, Mr. McCollum filed a claim seeking compensation for Mr. Veney. A prosecution integrity unit ("PIU") in the Wicomico County State's Attorney's Office investigated the claim, reinterviewing many of the witnesses from both trials. After an evidentiary hearing, Mr. Veney was awarded $716,777 in compensation. Mr. McCollum was awarded only $8,471.00 for over a decade of work. Ex. F (Board of Public Works Recommendation (May 17, 2023)).

Still, Mr. McCollum was not finished. During the investigation of Veney's conviction, prosecutors learned that A.A. had made nearly identical allegations against another individual,

18

Grant Jones, three years prior.[9] Jones' conviction was vacated, and Mr. McCollum then filed a

claim for compensation for Mr. Jones, securing him a $346,913.25 award. David Veney, along

with the prosecutor in the underlying cases, attended Mr. Jones' compensation hearing. Later,

Governor Wes Moore apologized to Mr. Veney and Mr. Jones. *See* Ex. G (Board of Public

Works Minutes (Dec. 13, 2023)). Tragically, Mr. Jones was in the final stages of a long-running

fight against cancer, and died not long after receiving compensation.



From left, State's Attorney Jamie Dykes, investigator Tracy Majors, lawyer Jameds McCollumn, Grant Jones, David Veney, Patrick Gilbert and Brendan Becker.

Mr. McCollum has helped many other clients as he did Mr. Grant and Mr. Veney:

quietly, with no need for recognition, and with little compensation. As discussed in greater detail

below, and recounted throughout the letters submitted to this Court, Mr. McCollum often put

tremendous time and effort into cases to achieve the outcome he viewed as just, even when there

was no prospect of compensation. As one writer explains:

> Mr. McCollum's clientele has always been largely the lower class, black
> population in Maryland. He has often gone without pay for the work that he did,
> whether that be defending someone wrongly accused of a crime, or even helping a
> church with their legal needs.

---

[9] Ken Otterbourg, *Grant Jones*, National Registry of Exonerations, https://exonerationregistry.org/cases/13587 (last accessed 12/21/2025).

Ex. C at 71 (Mark Wade, Jr.). He helps people in ways that are small but significant—assistance with a will, preparation for a hearing, a dispute with a company. "One thing that is consistent throughout, James conducts his professional practice through a strategy of listening to the needs of the client, demonstrating compassion and grace rather than condemnation, and devising a strategy that is achievable and appropriate." Ex. C at 49 (Patricia F. Mead).

Somewhat predictably, Mr. McCollum's law firm never became particularly profitable. Because of this, Mr. McCollum's family has struggled to get by for years. As described in more detail below, that reality is inextricably linked to the nature and circumstances of his criminal conduct in this case.









C.    **Mr. McCollum's personal characteristics.**

Across the letters submitted by Mr. McCollum's friends, family, and brethren, several themes stand out.

### 1. Integrity and honesty

First, many writers emphasize Mr. McCollum's unwavering integrity and honesty, both in his professional and personal life. A friend of 40 years, Reverend Dr. Mark J. Wade, writes:

> If I could only pick one word that sums up the character of Mr. McCollum, it is 'integrity.' His life, like his words, are always straight-forward, clear, and without any hidden agendas. As he has done in this case, he admits when he has missed it (as infrequent as that is), because his faith in God requires a Christ-like character for all to see as an example and a character worth striving for."

Ex. C at 74. Mr. McCollum's sister, Judith, and childhood friend, Mr. York both discuss Mr. McCollum's lifelong adherence to the Boy Scout law. Many others share similar insights:

- "I've always admired James as a person of integrity who never gives up on his clients, works incredibly hard, and as an attorney, is very dependable and loyal to his clients." Ex. C at 33 (Ray Hall).

- "James gifted us a Will & Power of Attorney as a wedding present—a gesture that was not only thoughtful but also reflected his desire to help others protect their families. This act stood out to me as a testament to his caring nature and professional integrity." Ex. C at 36 (Kay Hardy).

- "James is a man of deep integrity. He is the most honest person I know. He has a sterling reputation among his friends and former clients." Ex. C at 65 (Deborah Toler, Ph. D.).

Testimonials to Mr. McCollum's integrity and honesty are interwoven throughout the letters submitted in his support. They come from diverse sources, spanning four decades of friendship, family relationships, and professional associations.

### 2. Generosity and compassion

Mr. McCollum is also generous and compassionate. Yolanda Haywood, who has known Mr. McCollum for 40 years, recalls that:

24

One of the earliest memories I have of James is from a community clean-up event we both volunteered for. It was a hot summer day, and most people were ready to call it quits by noon. But James stayed behind, helping an elderly neighbor clear debris from her yard. He didn't do it for recognition—he just saw someone in need and stepped in. That's who James is: someone who quietly and consistently shows up for others.

Ex. C at 38. Several people who wrote the Court also discuss Mr. McCollum's long-time support for people who are unhoused or struggling. Vanessa Hall writes that:

[F]or approximately 15 years James never gave up on one homeless man in particular named ▉▉▉▉▉▉ would drop by James's office, usually unexpectedly, without shoes, sometimes hungry, and most of the time high on drugs. ▉▉▉'s own family wouldn't step up for him yet James did. . . .

For nearly 15 years, each time ▉▉▉ randomly dropped by to see James, James would give him shoes when needed, a meal if he was hungry, and during the winter, a jacket or coat for warmth. Today, ▉▉▉ is now safe and is settled with permanent accommodations for food and shelter, has access to his monthly funds, and is receiving ongoing care for recovery from addiction, in most part because James never gave up on ▉▉▉ and encouraged ▉▉▉ through his lifelong journey.

Ex. C at 67. This is just one of a long list of detailed examples of Mr. McCollum's service to others. For example:

- Mr. McCollum was walking down the street with his sister, and "observed an older gentleman, who had on dirty clothes and appeared to be homeless. We watched as he fell to the ground and didn't get up. We were a few feet away from him and we observed how several persons walked right past him without looking at him or offering any assistance. I admit that I had planned to do the same thing. However, as we got closer to this gentleman, James walked over to him, asked if he was alright and assisted him with getting up from the sidewalk. He also lifted him and placed him on a bench. I've thought of this incident many times and it made me realize what a special brother I have." Ex. C at 13 (Judith McCollum Stallings)

- A law school classmate shares that a mutual friend lives by themselves in DC ▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

- James "launched a legal ministry through his church to provide pro bono legal services to congregants." Ex. C at 28 (Manuel Geraldo).

25

Through these, and many other daily acts of generosity, Mr. McCollum translates his religious beliefs to action on a near daily basis.

### 3. Hard work and humility

Mr. McCollum is an extremely hard worker. Many writers to the court describe his long hours and dedication to his clients. Ray Hall, who connects with Mr. McCollum daily for prayer at 5:00 a.m., would often find that "he had already been at work since 3:00 or 4:00 a.m. Ex. C at 33. Reverend Wade has "only known Mr. McCollum to work six days per week, 8 to 10 hours per day, for decades." Ex. C at 74.

At the same time, Mr. McCollum is not materialistic. He has "never shown interest in material wealth," and has "lived modestly and focused on supporting his family rather than accumulating material possessions." Ex. C at 29 (Manuel Geraldo). Reverend Wade writes:

> I have found Mr. McCollum to be a true man of the people, who, while taking the best possible care of his family, does so with a modest income. Over the past 20 years, I have never seen him take a vacation outside of the country, and have never seen him take time off for his family, for more than 3 days at a time. Though Mr. McCollum graduated number 1 from his law school class and clerked for the Supreme Court, he choose to spend his professional career, not on Wall Street or Rodeo Drive, but providing desperately needed legal services for the poor, mistreated, and forgotten segment of our population. Mr. McCollum still drives a 2008 Honda Accord which he has had for the past 17 years.
>
> The richness of Mr. McCollum's professional life has not been found in purchasing a fleet of luxury vehicles, a yacht, a vacation villa or fancy jewelry, but rather has been spent on helping needy clients and his employees, demonstrating to his immediate family what the love of Christ really is.

Ex. C at 79. Another friend writes that "James is not swayed by material gain . . . He is only interested in the necessities of life, and he made it clear that he became a lawyer to help and serve people, not for fame or fortune." Ex. C at 75 (Paula Wade).

26

### 4. Remorse and accountability

There can also be no question that Mr. McCollum has demonstrated significant remorse, accountability, and acceptance of responsibility. As he writes to the Court:

> I failed to file all of my tax returns, to pay all of my taxes and to pay the taxes withheld from my employees' paychecks. I understand that our tax system relies on voluntary compliance, and that I failed in this regard. The taxes withheld from my employees' pay should have been forwarded and deposited to the government. When I used that money to keep the firm going, I made terrible decisions.

Ex. D.

In their letters to the Court, Mr. McCollum's friends and family confirm that he has acknowledged his misconduct to them forthrightly, writing that:



- Mr. McCollum "freely shared the details of what happened," and he did not object sharing the details with others because he "appreciates and needs our prayers." Ex. C at 14 (Stephanie Alston).

- "James has expressed deep remorse and acknowledged that his failure to address the issue sooner allowed it to grow out of control." Ex. C at 29 (Manuel R. Geraldo).

- "Mr. McCollum has acknowledged his offense, expressed deep remorse, and communicated to me and my family (and others) his profound and sincere commitment to spend the rest of his life making restitution." Ex. C at 21 (Carol Toler).

- "I know James has concerns as to how he can attempt to right the circumstances and financial implications his offense has created. It was a misstep in his character that he deeply regrets. He has expressed remorse, shame and grieves for what has happened." Ex. C at 67 (Iva Toler).

- "James has spoken to me openly and with deep remorse about the choices that led to this point. . . . He has talked about wanting to use this chapter of his life as a turning point—to mentor others, to give back more intentionally, and to rebuild trust. I believe in his ability to do just that." Ex. C at 38 (Yolanda C. Haywood).

Mr. McCollum has not minimized his conduct to his friends and family. He has taken responsibility for the mistakes he has made, and is committed to making things right by paying the restitution that he owes.



\*\*\*

Courts in other cases have exercised their discretion to impose non-Guidelines sentences based on the personal characteristics of the defendant. *E.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012) (premising downward variance, in part, on defendant's "big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact"); *Adelson*, 441 F. Supp. 2d at 513 (premising downward variance, in part, on

letters from "persons from all walks of life . . . attesting, from personal knowledge, to [defendant's] good works and deep humanity," his "generosity of spirt," and his "integrity and generosity"). Similar considerations are present here.

## III.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT LENIENCY.

Mr. McCollum's willful failure to pay over employment taxes to the IRS was motivated by a relentless focus on serving his clients. For Mr. McCollum, that focus was both his greatest professional gift and his greatest shortcoming. On the one hand, it shaped him into a highly regarded and supremely talented lawyer who achieved life-changing results for the many clients who trusted him with their cases. On the other hand, Mr. McCollum's dedication to his clients caused him to lose sight of what it takes to run a profitable law firm.

Mr. McCollum's crime was not a sophisticated or complex tax fraud scheme. He fell behind on his tax obligations because he simply did not have enough money to continue serving his clients and meet his financial obligations. Unfortunately, Mr. McCollum prioritized his firm and his clients at the expense of those obligations. And he understands the harm that decision caused and takes full responsibility for it. He knows he should have shut down his law firm many years ago. But contrary to the story the government would have this Court believe, Mr. McCollum never intended to deceive the IRS, and he made many attempts to catch up as his tax obligations grew.

### A.   McCollum's history of tax compliance and non-compliance reflects his firm's financial instability, not an effort to evade.

The government presents this case as a decades-long effort by Mr. McCollum to evade his tax obligations. That is not what happened.

Mr. McCollum has a long, albeit sporadic and imperfect, history of filing tax returns and paying his taxes—including paying over withheld employment taxes. For example, the

29

government's records show that between 2012 and 2015, Mr. McCollum regularly filed employment tax returns and regularly deposited employment taxes. By 2016, while Mr. McCollum had amassed a nearly million-dollar debt to the IRS, he had also deposited more than $800,000 worth of employment taxes. Between 2016 and 2019, Mr. McCollum paid nearly $180,000 in Maryland State taxes. And even once the IRS's collections efforts ramped up, Mr. McCollum continued to make efforts to pay. Between March 2020 and June 2021, Mr. McCollum paid a total of over $205,000 toward his outstanding tax liabilities.

To be sure, Mr. McCollum's tax compliance (or lack thereof) was unacceptable and illegal. But contrary to the government's suggestion otherwise, Mr. McCollum did not engage in a decades-long effort to evade the IRS. He simply was not making enough money to meet all of his personal and professional financial obligations and pay his taxes. The choice to prioritize the former over the latter was unacceptable. But Mr. McCollum's history of sporadic tax compliance reflects someone who was struggling to make ends meet—and whose response to that struggle was (unacceptably) to forego paying taxes—not someone who spent decades trying to evade the IRS.

### B.  Mr. McCollum was unable to run his law firm profitably.

For years, Mr. McCollum liberally granted discounts, took on pro-bono cases, covered litigation costs out of pocket, and sunk years of time into cases that had no hope of any significant financial return. And worse, when confronted with the reality that his law firm was not profitable enough to meet its payroll, tax obligations, overhead expenses, and other liabilities, Mr. McCollum prioritized his clients and their cases over those obligations. That was wrong. Indeed, it was illegal. And that choice harmed his employees and their families, the federal government, and, ultimately, the very clients he aimed to serve. Mr. McCollum did not make this choice for personal financial gain or prestige; he made it because he believed it was

best for his clients, many of whom were poor and had nowhere else to turn for legal services that

could remedy the injustices they had suffered. That is, of course, no excuse for Mr. McCollum's

crime. But his decision not to pay over withheld wages to the IRS stemmed from his inability to

say "no," or to look the other way when someone of limited financial means asked him for help.

> Symone puts it best:

> The question of why James did not realize that he was way over his head is not difficult to answer. James was over his head from day one. He founded the law practice on the wings of hope and prayer. . .

> There were always cracks at the foundation of this practice: chronic underfunding, an unorthodox business philosophy, a history of trauma that often left James blind to reason and immobilized to act on his own behalf, poor boundaries, emotion driven money decisions, and the choice to isolate versus the choice to solicit wise counsel and to implement proven methods of practice. The kinks in the chain are many.

Ex. C at 2.

Mr. McCollum prioritized serving his clients, and pursuing justice on their behalf, over

generating profits. As his friend and former law school classmate Olandan Davenport writes,

"Being of service is in his DNA." Ex. C at 22. Another friend, Ray Hall, writes "The phrase that

sums up how I would describe James's character since I've known him is that he seemingly

'gives more than he takes.'" Ex. C at 33. Consistent with those values—but inconsistent with

running a profitable business—when Mr. McCollum opened his own law firm, he took nearly the

*opposite* approach from the one he had experienced at Covington & Burling. He focused his

practice on representing individuals and small, community-based, organizations. And he

*minimized* profits in order to represent those clients because he believed they deserved first-rate

legal representation and knew they might not otherwise be able to afford it. As his friend Isaac

Marks writes:

> While he could have no doubt worked for a large law firm and been compensated handsomely (which probably would have allowed him to avoid the situation he is

31

in today), he sacrificed to open a neighborhood law firm that focused on providing for the legal needs of the community – sometimes to his financial detriment.

Ex. C at 45. Mr. McCollum's choice to forego a large and stable salary from a big law firm with high-paying clients, in favor of a modest, community-focused firm, was a deliberate choice that reflects his deeply held values and beliefs. But that choice did not build the foundation for a financially successful or sustainable law firm.

The character letters that have been written on Mr. McCollum's behalf are replete with examples of Mr. McCollum performing legal work for free just because he believed it was the right thing to do. ████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████ The letters written by many of his friends and former clients express the same sentiment:

- ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

- I have known him to always be honest and generous. ████████████ ███████████████████████████████. Ex. C at 68 (███████████).

- ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

32

Mr. McCollum also poured enormous amounts of time and money into mentoring young

lawyers. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████ Many of Mr.

McCollum's mentees are now successful lawyers in their own right, and they include sitting

judges. Ex. C at 52 (███████████) ████████████████████████

██████████████████████████████████████████████████████████

████████████

Mr. McCollum was also loyal to his employees to a fault. And it was exactly this loyalty

that ultimately victimized these same employees. Mr. McCollum simply refused to fire

employees. ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



Ex. C at 53.

Mr. McCollum prioritized serving his clients in need, and trying to keep his employees on the payroll, over his tax obligations. Indeed, he prioritized those goals over his *own* needs and his family's needs. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████

Whatever the explanation for Mr. McCollum's hyper-focus on serving others at the expense of himself, his choices were not okay. It was not okay for Mr. McCollum to choose not to pay his taxes. It was not okay for Mr. McCollum to continue to employ people when his firm was not bringing in enough money to pay them. And the short-term benefits to his employees of keeping them on the payroll may well be outweighed by the longer-term harm Mr. McCollum caused those same employees by failing to pay over the money he withheld from their paychecks. But Mr. McCollum committed this crime in an effort to represent clients in need,

34

most of whom could not afford the top-tier legal representation Mr. McCollum knew he could

provide. And he committed it in an effort to help his employees by keeping them on the payroll.

While he takes full responsibility for the illegality of those choices, and the harm they caused,

this was not a crime that was committed out of greed or financial self-interest. It was a crime that

was committed in the pursuit of helping others and doing good deeds.

C.    **The COVID-19 pandemic had a devastating impact on Mr. McCollum's law firm.**

Like it did for many businesses, COVID-19 ravaged Mr. McCollum's law firm. His

paying clients faced difficult financial circumstances, new clients were hard to find, and his

employees (like everyone else) were facing very challenging personal and financial

circumstances. His sister Judith writes:

> I remember ever since COVID-19, we've talked more often and he shared with me about the stressors he was facing regarding his law practice. James shared with me that persons he had provided services for were unable to pay him and he was not only concerned about keeping his practice open, but being able to look out for his employees and making sure he would still be able to pay them.

Ex. C at 13. Mark Wade Sr. also attests to the difficulties Mr. McCollum faced during the

pandemic:

> Mr. McCollum went through COVID-19, our country's worst public health crisis in more than 100 years, where his case load as a private practice attorney dwindled down to almost nothing. Yet, Mr. McCollum did not fire one staff person because he cared as much about his employees and their families as he did about his own. He even cared about his clients, who couldn't or wouldn't pay, and their families as much as he did about his own.

Ex. C at 74.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



**D.**

████████████████████████████████████████████████

████  Either way, Mr. McCollum desperately needed help. Unfortunately, however, the person handling his tax controversy made his problems worse, not better.

     **E.**     **Mr. McCollum received ineffective tax representation from ██████████.**

In 2004, ████████████████████████████████████████., began preparing tax filings for Mr. McCollum and his family, as well as Mr. McCollum's law firm. ████████ had inherited Mr. McCollum's business after he purchased an accounting firm owned by Mr. McCollum's former tax preparer and certified public accountant ("CPA") after his death. While Mr. McCollum takes sole responsibility for the crime he committed, ████████ served him very poorly.

According to discovery, █████████████████████████████████████████ ████████████████████████████. He is not a CPA and did not graduate from college. ████████ tax preparation business now consists of approximately 80% personal income tax preparation and approximately 20% business tax preparation. While he estimates that 99% of his business involves tax return preparation, he also agrees to represent clients before the IRS in tax controversies.

Over the years ████████ has struggled with tax compliance himself, including during the time he was representing Mr. McCollum before the IRS. At various times, both the state of Maryland and the IRS have issued tax liens against ████████████████████████████ ██████████████████████████. ████████ own tax problems are no excuse for Mr. McCollum's. But his lack of diligence and attention to detail about his own tax obligations reflects a pattern that is consistent with how he represented Mr. McCollum before the IRS.

On a foundational level, the discovery in this case reflects that ████████ failed to return the IRS's calls, failed to provide the IRS with information he said he would, provided inaccurate

37

information to the IRS, and provided Mr. McCollum with generally poor tax advice. To provide just a few examples, according to the government, the IRS attempted to contact ████████ on December 19, 2018, and January 28, 2019. On both occasions, the IRS left voicemails and asked ████████ to return the calls. He did not. Instead, even after IRS agents visited ████████ office on February 22, 2019 (after having visited Mr. McCollum's office), and left a package of information for him, ████████ took nearly a month to respond before calling the IRS on March 21, 2019.

As another example, ████████ told the IRS on September 17, 2019, that he was *finalizing* an offer in compromise package on Mr. McCollum's behalf and that he would submit it to the IRS within the next two weeks. It took him more than five months to submit that package, and, as it turned out, he submitted the wrong form. It took another six weeks for him to submit the correct form.

Mr. McCollum should have recognized ████████ ineffectiveness. More importantly, he should have been far more diligent about overseeing ████████ work, confronting his tax obligations, and working to resolve them *himself*. But as explained in more detail above, Mr. McCollum was trying to balance the demands of his caseload, the disruption caused by the COVD-19 pandemic, and extraordinarily difficult family and health circumstances. And he was disorganized, stressed, and simply did not focus on or prioritize the financial health of his law firm. None of those things justified losing focus of his tax obligations, but ████████ representation provided Mr. McCollum with a false sense of security that his tax controversy was in good hands.

By the time Mr. McCollum realized how ineffective ████████ had been, it was too late. Because his case was on the brink of a criminal investigation, Mr. McCollum hired ████

██████ a tax attorney, CPA, and certified fraud examiner. With ██████████ advice, Mr. McCollum sat for a taxpayer conference and cooperated fully with IRS investigators.

To be clear, Mr. McCollum is the only one who is responsible for the crime he committed here. But ██████████ ineffectiveness exacerbated, rather than mitigated, Mr. McCollum's tax problems.

### F. Mr. McCollum did not intend to deceive the IRS by creating The McCollum Firm in 2019.

The government argues that Mr. McCollum attempted to deceive IRS investigators in early 2019 by creating a new corporate entity called The McCollum Firm, with a new employer identification number ("EIN"). The government argues that this was an effort to avoid the IRS's collections efforts. Relatedly, the government argues that Mr. McCollum failed to disclose the corporate bank accounts associated with The McCollum Firm on forms that were submitted as part of the offer in compromise process.

Mr. McCollum changed the name of his firm because he recognized that, as a result of the firm's financial situation, the time was coming for him to lay off his associates. Because he had represented a client years ago who was in legal trouble for running a corporate entity with "associates" in the name but no associate employees, Mr. McCollum set out to change his firm's name from McCollum & Associates to The McCollum Firm.

Mr. McCollum was not trying to hide this new entity to use it as a way of evading the IRS. First, his name was on the articles of organization, and he was still working at the same location, for the same clients, with the same employees. Second, and more importantly, there was nothing to hide. This is not a case where someone was stashing money away in bank accounts owned by a secretive alter ego corporate entity to evade the IRS's detection. Mr.

McCollum was not trying to hide from the IRS; he simply was not making enough money to continue representing his clients, pay his employees, and meet his federal tax obligations.

Moreover, Mr. McCollum created The McCollum Firm less than three weeks after the IRS first attempted to contact ▮▮▮▮▮▮▮, by leaving him a voicemail, in an effort to ramp up its collection efforts. It is not clear, however, whether ▮▮▮▮▮▮▮ even told Mr. McCollum about the voicemail he received.

That said, Mr. McCollum failed to disclose The McCollum Firm's bank accounts on the forms that were submitted with the offer in compromise submissions. For this, Mr. McCollum takes full responsibility. While these forms were prepared by ▮▮▮▮▮▮▮, Mr. McCollum should have reviewed them more carefully to ensure that every bank account associated with both McCollum & Associates and The McCollum Firm had been disclosed.

### G.    Mr. McCollum has worked cooperatively with the IRS and has taken full responsibility for his failure to pay over employment taxes.

Contrary to the government's narrative that Mr. McCollum engaged in subterfuge, Mr. McCollum has repeatedly taken responsibility for the full amount of employment taxes he owes. In February 2021, Mr. McCollum agreed to a Trust Fund Recovery Penalty that was assessed against him and, in doing so, acknowledged the full extent of his employment tax obligations. In February 2023, Mr. McCollum agreed to be interviewed by IRS agents and answered their questions fully and honestly for several hours.

In March of 2025, within approximately one month of undersigned counsels' appointment, without the benefit of full discovery, and without even forcing the government to indict him (much less to litigate pretrial motions or proceed to trial), Mr. McCollum agreed to plead guilty to his failure to pay over employment taxes. On the same day, he took the painful step of laying off all of his employees. Just a few months later, Mr. McCollum had wound down

all of the firm's pending matters, shut down the firm entirely, and consented to disbarment in both Maryland and Washington, D.C. Those are not the actions of someone intent on obfuscation and subterfuge.

Despite Mr. McCollum's legal talent, he was not a good businessman. He prioritized his clients, his own passion for practicing law, and his desire to keep his employees on the payroll, ahead of paying his taxes. That was unacceptable and illegal, and it caused real harm to both his employees and the federal government. And as a sophisticated lawyer, Mr. McCollum certainly knew better. But Mr. McCollum did not intend to defraud, deceive, or evade the IRS. And he has repeatedly, and earnestly, accepted responsibility for his conduct.

## IV. THE REMAINING SENTENCING FACTORS SUPPORT A SENTENCE OF PROBATION

### A. Just punishment and respect for the law would not be served by incarceration.

Mr. McCollum has already paid a heavy price for his conduct. He has lost the ability to practice law, consenting to disbarment in Maryland and the District of Columbia.  Ex. I & J (MD & DC voluntary disbarment orders). The practice which he spent a life building is now shuttered; the clients he has devoted himself to helping have been referred to other lawyers. As a classmate from Howard Law writes: "James McCollum has pleaded guilty and consented to disbarment. He knows what he did was wrong, as a citizen and as a member of the bar. I am certain the embarrassment, shame, and regret have equally punished him and will continue to do so." Ex. C at 31 (CeLillianne Green).

When a person suffers harsh collateral consequences from a conviction, the sentencing court may take account of those already occurring punishments in fashioning a sufficient sentence. *See, e.g., United States v. Blake*, 841 Fed. App'x 535, 539 (4th Cir. 2021); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005). Here, the loss of Mr. McCollum's

legal career and his fall in the community are great punishments that should factor into the Court's § 3553(a) analysis. *See United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (holding it was proper for sentencing court to apply a 36-month downward departure because the child pornography defendant lost his teaching certificate and his state pension as a result of his conviction); *see also United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. 2016) (imposing one-year probation sentence for drug trafficking defendant in large part because the defendant would suffer a "civil death" because of the conviction).

It is also significant that several of Mr. McCollum's employees have written the Court to seek mercy on Mr. McCollum's behalf.

In any case, a sentence of probation is itself a serious punishment. The Supreme Court has recognized that a supervisory sentence imposes significant punishment. "Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty," including

42

travel and employment restrictions, regular reporting, permitting unannounced visits to their home, restrictions on associating with certain individuals, and, in many cases, substance abuse monitoring. *Gall v. United States*, 552 U.S. 38, 48–49 (2007). Mr. McCollum will experience an adequately severe punishment with the recommended sentence.

**B.    Incarceration is not necessary to afford adequate deterrence or to protect the public.**

The needs "to afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(B)–(C), would not be served by a custodial sentence for Mr. McCollum.

*First*, incarceration is not necessary to either protect the public from Mr. McCollum or to deter him from committing future offenses. Mr. McCollum is not a danger to society. He has been out of custody, with a perfect pretrial services record, since his re-arraignment in this case. He has taken significant steps to address the circumstances that led to his offense by closing his law firm, letting his employees go, and agreeing to voluntary disbarment. His conviction also brings with it so-called "civil death," the operation of the "[m]yriad laws, rules, and regulations" that impose "penalties, disabilities, or disadvantages" based on a felony conviction alone. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016).

There is also no reason to believe that Mr. McCollum will ever again be in a position to commit this type of crime. ███████████████████████████████ ███████████████████████. He will never again have his own business or employees.

*Second*, a sentence of incarceration is not needed for general deterrence purposes. Mr. McCollum's case has garnered tremendous attention from the legal community within and outside of Maryland. *See* Ex. K (Compilation of Press). The District of Columbia Court of

Appeals and [Maryland court] have published reports recommending Mr. McCollum's disbarment. Mr. McCollum has consented to these actions in both jurisdictions. Imprisonment is not needed to send the community the message that employers must pay over all money withheld for their employee's taxes. Watching the fall of such a respected lawyer is a forceful deterrent to any person who might be similarly situated to Mr. McCollum.

C.    **The Bureau of Prisons ("BOP")** ███████████████
████████████

Mr. McCollum's age ██████████████ also counsel in favor of a non-incarcerative sentence. Section 3553(a)(2)(D) directs that, in crafting a sentence, the Court should consider the need "to provide the defendant with needed . . . medical care . . . in the most effective manner."

████████████████████████████████

████

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████ There is no reason to think that the Bureau of Prisons could meet this challenge. It is an agency "in shambles," that faces "dire straits;" it is a "bureau on the brink, scarred by decades of failure." These are the words not of an activist but of the Bureau's

44

own Deputy Director in an extraordinary video message published recently by the BOP. *See* Federal Bureau of Prisons, *A Bureau on the Brink*, YouTube, (Nov. 22, 2025).[10]

For years, multiple sources, including publications from the Department of Justice's Office of the Inspector General, have cast serious doubt on the BOP's ability to adequately address the needs of aging and ill inmates due to severe understaffing and under-resourcing—a longstanding issue that has only grown worse.[11] The DOJ's own Inspector General has repeatedly documented that BOP cannot provide timely access to basic medical care, lacks adequate medical staffing at catastrophic levels, fails to conduct preventative screening for treatable conditions,[12] operates facilitates with deteriorating infrastructure and unsanitary conditions, and cannot accommodate the basic needs of aging inmates.

For example, according to a September 2023 report, BOP's medical personnel shortage stood at 82 percent.[13] Even medical facilities are not appropriately staffed. A 2024 OIG inspection of Federal Medical Center Devens found the medical institution had only one physician and the Clinical Director to manage care for approximately 941 inmates, as two of six

---

[10] https://youtu.be/CM9LMubPmXY?si=Gz6WTbO4IQr3KPKd.

[11] *See* U.S. Department of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf; U.S. Department of Justice Office of the Inspector General, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, Report 24-041 (Feb. 2024), https://oig.justice.gov/reports/evaluation-issues-surrounding-inmate-deaths-federal-bureau-prisons-institutions.

[12] U.S. Department of Justice Office of the Inspector General, *DOJ OIG Releases Report Evaluating the Federal Bureau of Prisons' Colorectal Cancer Screening Practices* (May 21, 2024), https://oig.justice.gov/news/doj-oig-releases-report-evaluating-federal-bureau-prisons-colorectal-cancer-screening.

[13] U.S. Department of Justice, Office of the Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan* at 9 (May 2024),

physicians were on extended leave without pay and three positions were vacant.[14] After the inspection, the Clinical Director retired, leaving only one physician at the institution to provide daily patient care.[15] In March 2022, the OIG published an audit of the health care contracts at three BOP prisons, including two medical facilities and one standard-care facility; the audit found the BOP's contractor did not provide the specialty care required by their own contract, nor did the BOP have an adequate method of tracking off-site medical providers.[16]

As a 70-year-old man, Mr. McCollum already stands at significant risk of poor health outcomes if incarcerated. Research indicates that a 59-year-old in prison has the same morbidity rate as a nonincarcerated 75-year-old, and people in prison are much more likely to show signs of cognitive decline, including dementia, at an earlier age.[17] The psychological strain of incarceration has far-reaching implications for cognitive health.[18] ████████████

████████████████████████████████████████████

████████████████ Further, the staffing shortages and other challenges in BOP would

---

[14] U.S. Department of Justice Office of the Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens* at i (Dec. 2024), https://oig.justice.gov/sites/default/files/reports/25-009.pdf.

[15] *Id.*

[16] Department of Justice, Office of the Inspector General, *Audit of Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School* (Mar. 17, 2022) (available at https://tinyurl.com/2022BOPIGMEDICAL).

[17] Farah Acher Kailksow, *et al.*, *Caring for the Rapidly Aging Incarcerated Population: The Role of Policy*, 49 J. Gerontol Nurs. 7 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10129364/.

[18] Jalayne J. Arias et al., *Crime, Incarceration, and Dementia: An Aging Criminal System*, 29 Am. J. Law & Med 193 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11524525/.

make it highly unlikely that BOP ███████████████████████████████

███████

███████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████

### D.     The advisory guideline range, driven primarily by the "loss" amount, is an inaccurate measure of culpability.

As stipulated by the parties and set forth in the PSR, the applicable sentencing guideline for Mr. McCollum's failure to pay over employment taxes to the IRS is U.S.S.G. § 2T1.6, and the base offense level is determined by the tax table in § 2T4.1. ECF No. 10 at 4-5. The parties agree that, under § 2T4.1(I), the base offense level is 22 because the total tax loss is greater than $1.5 million but less than $3.5 million. *Id.* at 5. The parties have agreed that Mr. McCollum should receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). *Id.* And the government has agreed to make a motion for a third point under § 3E1.1(b). *Id.* The government also agreed not to oppose a two-level downward departure if the Court determines that Mr. McCollum is eligible for the zero-point offender reduction under U.S.S.G. § 4C1.1, *id.*, and Probation has determined that Mr. McCollum is, in fact, eligible for that downward departure. PSR ¶ 23. The resulting adjusted offense level is 17. *Id.* ¶ 26.

Mr. McCollum has no criminal history points. *Id.* ¶ 29. With a criminal history category I and a final offense level of 17, the resulting guidelines range is 24-30 months. *Id.* ¶ 48.

In considering the appropriate sentence, the Court should take into consideration the inherent flaws in the tax loss guidelines because the offense levels it produces are driven entirely by the loss table in § 2T4.1. The guidelines' loss tables have been widely criticized because economic loss is a flawed measure of culpability. Many have noted that "because of their arithmetic approach and also in an effort to appear 'objective,' [the guidelines] tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d at 508. In *United States v. Shusterman*, No. JKB-13-460, for example, Judge Bredar criticized the loss table in U.S.S.G. § 2B1.1: "the way the guidelines tie culpability so much to the amount of loss" is "a concept that I have a big problem with, on policy grounds. . . . And a bigger problem the bigger the number gets." *Shusterman*, No. JKB-13-460, ECF No. 296 at 21:6-11 (12/23/2016 Sentencing Tr.). The same is true here with respect to the loss table in § 2T4.1.

### E.     A sentence of probation would not create unwarranted disparities.

This Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Courts in this district have imposed probationary sentences in cases with far more aggravated conduct and far fewer mitigating circumstances. The Court should do the same here.

In *United States v. John Worthington*, JRR-23-189 (D. Md. Nov. 21, 2023), a restaurant owner pled guilty to willfully failing to account for and pay over employment taxes, in violation of 26 U.S.C. § 7202, and willfully making and subscribing a false tax return, in violation of 26 U.S.C. § 7206(1). *Worthington*, JRR-23-189, ECF No. 36 (judgment). In total, between 2010 and 2021, Mr. Worthington failed to report and pay over more than $2.8 million in employment taxes to the IRS. *Worthington*, JRR-23-189, ECF No. 11 at 11 (plea agreement). And the government

48

had no record of Mr. Worthington *ever* having filed Forms 941 since he became the sole owner of the restaurant in 1995. *Worthington*, JRR-23-189, ECF No. 22 at 1 (Gov't Sent'g Mem.). In 2016, Mr. Worthington also filed an individual tax return that he knew contained a materially false statement, which resulted in him receiving a $9,096 refund when, in fact, he owed the IRS $15,111 in taxes for tax year 2016. *Worthington*, JRR-23-189, ECF No. 11 at 11-12 (plea agreement).

Unlike Mr. McCollum, Mr. Worthington used the wages he withheld from his employees' paychecks to fund a luxurious lifestyle. He used that money on "mortgage payments for his personal residence, various personal vehicle expenses, college tuition and expenses for his two children, golf club membership dues, season tickets to the Baltimore Orioles, international vacations, and salaries for himself and his wife, among other expenses." *Worthington*, JRR-23-189, ECF No. 11 at 11 (plea agreement).

Like Mr. McCollum's, Mr. Worthington's guidelines range was 24-30 months based on an offense level of 17 and a criminal history category I. *Worthington*, JRR-23-189, ECF No. 22 at 11 (Gov't Sent'g Mem.). The government requested a sentence of 27 months. *Id.* at 2-3. Judge Rubin sentenced Mr. Worthington to three years of probation, four months of home detention, and 300 hours of community service. *Worthington*, JRR-23-189, ECF No. 36 at 3 (judgment). Mr. McCollum's conduct was far less aggravated than Mr. Worthington's, and—especially when accounting for the circumstances that mitigate Mr. McCollum's conduct—he is more deserving of a probationary sentence than Mr. Worthington was.

This Court has also imposed probationary sentences in other similar cases. For example, in *United States v. Venuti*, WMN-10-235 (D. Md. Nov. 2, 2010), John Venuti pled guilty to three counts of willful failure to file tax returns in violation of 26 U.S.C. § 7203 and acknowledged a

49

tax loss of approximately $800,000 over six years. *Venuti*, WMN-10-235, ECF No. 6 at 9 (plea agreement). At the time of his prosecution, Mr. Venuti was a principal and tax consultant at KPMG. *Id.* Prior to his work at KPMG, however, he worked at the IRS between 1974 and 1983, including for a period of three years as a Division Chief of the Tax Treaty and Technical Services Division. *Id.* His gross income for the six years in which he failed to file tax returns was more than $3.6 million. *Id.* Judge Nickerson sentenced Mr. Venuti to three years' probation, 6 months of home detention, and 400 hours of community service. *Venuti*, WMN-10-235, ECF No. 16 at 2-3 (judgment). While Mr. Venuti's case involved different conduct, and a lower tax loss, Mr. Venuti was an extremely well-paid and sophisticated tax professional who failed to pay his taxes. Again, if a probationary sentence was appropriate in Mr. Venuti's case, this Court should find it appropriate here, too.

**F.      A sentence of probation prioritizes the need to provide restitution.**

Shortly after he shut down his law firm and consented to disbarment, Mr. McCollum found a job working for the National Minority Quality Forum, a nonprofit research and educational organization. As his current boss, Gary Puckrein writes:

> James is currently employed by the National Minority Quality Forum. In his work with us, he is helping to address the very structural failures in healthcare that he and his family experienced. He brings to this work not only his legal skills but also his direct understanding of how families are harmed when the healthcare systems fail them. He is a valuable member of our team. If the opportunity presents itself, we would continue his employment.

Ex. C at 55. In his new role, Mr. McCollum has found yet another way to serve the community while also making money to begin paying his forthcoming restitution obligation. Not only would a sentence of incarceration frustrate the need for him to earn money to pay toward restitution, but it would also place Mr. McCollum's family at risk by eliminating his source of income to contribute to their basic needs.

50

## V.    SENTENCING HEARING

At the January 7, 2026, hearing in this matter, Mr. McCollum may call the following people to speak on his behalf:

| Name | Expected Remarks | Anticipated Length of Remarks |
|---|---|---|
| ███████████ | ███████████████████████████████████ | 5 minutes |
| Billy Murphy | Mr. Murphy is a friend witness who will address Mr. McCollum's history and characteristics. | 5 minutes |
| David Veney | Mr. Veney is a former client who will address Mr. McCollum's history and characteristics. | 5 minutes |
| Deborah Toler | Ms. Toler ████████████ will address Mr. McCollum's history and characteristics. | 5 minutes |
| Judge Scott Carrington | Judge Carrington is a mentee of Mr. McCollum who will address Mr. McCollum's history and characteristics. | 5 minutes |
| Rev. Dr. Mark J. Wade, MD | Mr. Murphy is a friend who will address Mr. McCollum's history and characteristics. | 5 minutes |
| Silas Elwood York | Mr. York is a childhood friend who will address Mr. McCollum's history and characteristics. | 5 minutes |
| Symone Colquitt | Mr. McCollum's wife will address his history and characteristics. | 5 minutes |

## VI.    CONCLUSION

The ramifications of this case have touched every corner of Mr. McCollum's life. The doors to a law practice he spent his life building are shuttered, he can no longer practice law, and a once-sterling reputation is shattered.

In the face of this, one might expect Mr. McCollum to be depressed and hopeless. That is not the case. ████████████████████████████████████████████████████, he explained that he viewed this prosecution as a divine intervention. Like Symone, he believes that without interdiction, he likely would have died at his desk, encumbered by stress and desperation.

51

Now, he has taken responsibility for his crimes, and can dedicate the rest of his life to atonement, working to repay the restitution owed, and living a life of faith and devotion. As his sentencing draws near, Mr. McCollum finds himself meditating on Micah 7, the bible passage quoted at the outset of this submission. He interprets it to mean that a person must have courage to admit guilt: to not do so is an act of cowardice. He must stand up, take responsibility, and rely on the mercy, forgiveness, and divinity of God.

For all these reasons, a sentence of probation is sufficient but not greater than necessary to effectuate the purposes of sentencing.

Dated: December 24, 2025

Respectfully submitted,

JAMES WYDA
Federal Public Defender


/s/ Patricia L. Richman
Patricia L. Richman (Bar No. 803572)
ASSISTANT FEDERAL PUBLIC DEFENDER
6411 Ivy Lane
Suite 710
Greenbelt, MD 20770
Phone: (301) 344-0600
Fax: (301) 344-0019
Email: patricia_richman@fd.org

/s/ Jonathan Hettleman
Jonathan Hettleman
ASSISTANT FEDERAL PUBLIC DEFENDER
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
Fax: (410) 962-3976
Email: jonathan_hettleman@fd.org